In re Dinishia D. WATERS, Debtor.

Dinishia D. Waters, Plaintiff,

v.

The Money Store, First Union Trust Company and/or Pan American Financial Services, Defendants.

Bankruptcy No. 01 B 22756.
Adversary No. 02 A 00186.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 25, 2002.

880

Michael Burr, Robert J. Adams & Associates, Chicago, IL, for plaintiff.

Marilyn O. Marshall, Chicago, IL, Chapter 13 Trustee.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on a complaint filed by the Debtor, Dinishia D. Waters (the "Debtor"), to avoid a junior mortgage lien on certain real property owned by the Debtor. The Defendants failed to answer the complaint and summons served upon them on February 21, 2002, as shown by the return of service filed. On April 3, 2002, the Court entered an Order finding the Defendants in default pursuant to Federal Rule of Civil Procedure 55(a), incorporated by reference in Federal Rule of Bankruptcy Procedure 7055. This Opinion constitutes the findings and conclusions supporting the default judgment entered against the Defendants under Rule 55(b)(2). For the reasons set forth below, the Court holds that the junior mortgage lienholder is wholly unsecured and its lien should be stripped off the Debtor's real property and avoided pursuant to 11 U.S.C. § 506(d).

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

## II. FACTS AND BACKGROUND

On June 27, 2001, the Debtor filed a Chapter 13 bankruptcy petition. On February 20, 2002, the Debtor filed a complaint to avoid a junior mortgage on property owned by the Debtor and located at 1520 N. Lavergne Avenue, Chicago, Illinois (the "Property"). Thereafter, on February 21, 2002, the Debtor filed and served a substitute complaint. None of the Defendants filed an answer to the complaint. On April 3, 2002, the matter was set for status before the Court. On April 4, 2002, the Debtor filed supplemental authority in support of the complaint.

On May 15, 2001, an appraiser estimated the Property value at $87,000.00. See Exhibit A to the Complaint. On August 6, 2001, Wells Fargo Home Mortgage, Inc., as the first mortgage lienholder on the Property, dating from 1995, filed a proof of claim in the total amount of $92,361.99. See Group Exhibit B to the Complaint. Pan American Financial Services, Inc. ("Pan American") held a junior mortgage on the Property, dating from 1997, that was originally granted in the sum of $29,916.15. See Exhibit C to the Complaint. In October 1999, First Union Trust Company ("First Union"), as servicing agent, filed a mortgage foreclosure complaint in the Circuit Court of Cook County, Illinois, on behalf of Pan American. Id. The complaint alleged a balance due of $29,837.22. Id. Also, in October 1999, The Money Store sent the Debtor a mortgage account statement alleging the sum of $3,999.52 due under account number 75046698, presumably secured by the

junior mortgage. *See* Exhibits D and E to the Complaint. It is not at all clear which of the Defendants presently holds the junior mortgage, but that is not outcome determinative, because whoever is the holder of the same is equally affected by the Court's holding in this matter.

On August 22, 2001, the Court confirmed the Debtor's plan. The plan, which was filed on June 27, 2001, prior to the mandatory use of the model plan format, provides for 100% payment to secured and priority claimants over a thirty-six month period. The Debtor's monthly payments to the Chapter 13 Standing Trustee are $401.00. Further, the plan provides for a 10% payment to unsecured claimants. No specific treatment was made for the junior mortgage claim at bar. The plan is a "percentage" plan under which the Debtor is the disbursing agent for current mortgage payments, with arrearages to be paid pro rata from plan payments disbursed by the Chapter 13 Standing Trustee assigned to this case.

## III. *DISCUSSION*

■ The ultimate issue before the Court is one not yet resolved by the Seventh Circuit: whether in a Chapter 13 case, a wholly unsecured junior mortgage may be stripped off pursuant to 11 U.S.C. § 506(d), notwithstanding the anti-modification protection afforded holders of home mortgages in 11 U.S.C. § 1322(b)(2).

Section 1322(b)(2) of the Bankruptcy Code provides that a "plan may ... modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." 11 U.S.C. § 1322(b)(2) (emphasis supplied). Section 506(a) of the Bankruptcy Code, in turn, provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim." 11 U.S.C. § 506(a). Section 506(d), in turn, provides that "[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void...." 11 U.S.C. § 506(d).

■ In *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), the United States Supreme Court held that after correctly applying these two provisions, a lien "strip down" of an undersecured home mortgage lien is impermissible for claims secured by principal residences, because it modifies the total package of rights for which such a claim holder bargained. *Id.* at 332, 113 S.Ct. 2106. A lien "strip down" reduces an undersecured lien to the value of collateral, in contrast to a lien "strip off," which removes a wholly unsecured junior lien. *See In re Lam,* 211 B.R. 36, 37 n. 2 (9th Cir. BAP 1997), *appeal dismissed,* 192 F.3d 1309 (9th Cir.1999). The issue before the Court is whether *Nobelman* likewise prohibits lien "strip offs." [1]

1. *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), is inapposite, not controlling, and fails to resolve the instant legal issue. The result in *Dewsnup* was based upon a lack of congressional intent to permit the modification of secured claims in Chapter 7 cases, but in Chapter 13 cases, the general rule contained in the provision here at issue (§ 1322(b)(2)) supplies necessary evidence of intent. *See In re Mann,* 249 B.R. 831, 833 n. 4 (1st Cir. BAP 2000).

882

While the bankruptcy courts across the country are somewhat evenly split on the issue, the higher courts are unanimous in supporting the majority position, which allows lien stripping of wholly unsecured junior mortgage liens. The Second Circuit, Third Circuit, Fifth Circuit, Sixth Circuit, and Eleventh Circuit all agree that a lien strip off is permissible after *Nobelman.*[2] The Seventh Circuit has not directly ruled on this issue. The only variance in this uniformity among the circuits is an Eleventh Circuit opinion, which disagrees with the panel that originally decided the issue, but which follows the prior decision as established precedent in that circuit.[3] Additionally, the Debtor cites to local precedent in the United States District Court for the Northern District of Illinois, where Judge Darrah agreed with the majority view.[4] Nonetheless, in the United States Bankruptcy Court for Northern District of Illinois, Judge Schmetterer, in a strongly reasoned opinion, took the position that § 1322(b)(2) bars lien strip offs after *Nobelman.*[5] This is one of those rare occasions when the Court respectfully disagrees with Judge Schmetterer and, accordingly, concludes that a rule permitting lien strip offs after *Nobelman* is the better rule, because the analysis done in favor of this position is more comprehensive and responds to every contention of those authorities ruling that *Nobelman* bars lien strip offs. The Court will summarize the arguments on both sides of this issue.

### A. Analysis Based on Bankruptcy Code and the Text of Nobelman

In *Nobelman,* the bank filed a proof of claim for a total of $71,335, but this amount was secured only by a home worth $23,500. *See* 508 U.S. at 326, 113 S.Ct. 2106. Unlike the holder of the junior mortgage here, which is wholly unsecured under § 506(a), the creditor in *Nobelman* was "undersecured" meaning that part of its underlying claim was "secured" by the value of the home and the remaining amount of the debt over the value of the home was "unsecured" after applying § 506(a) language. The debtor in *Nobelman* proposed to treat the unsecured portion of the debt as an unsecured claim pursuant to § 506(a), thereby paying the bank nothing on this portion of the bifurcated claim under the terms of the Chapter 13 plan. *See id.* The Supreme Court emphasized that the debtor failed to adequately consider § 1322(b)(2)'s focus on the prohibition against modifying the whole bundle of "rights of holders of secured claims" that are "claim[s] secured only by a security interest in real property that is the debtor's principal residence." *Id.* at 330, 113 S.Ct. 2106 (citing 11 U.S.C. § 1322(b)(2)). Thus, the protection of the unsecured portion of the bank's claim was ultimately based on the existence of enforceable mortgage instruments giving the bank state-law rights, not on the existence of value to support the lien. *See id.* at 329 30, 113 S.Ct. 2106. The Supreme Court also noted that the exception at issue in

**2.** *See In re Pond,* 252 F.3d 122 (2nd Cir.2001); *In re McDonald,* 205 F.3d 606 (3d Cir.2000), *cert. denied,* 531 U.S. 822, 121 S.Ct. 66, 148 L.Ed.2d 31 (2000); *In re Bartee,* 212 F.3d 277 (5th Cir.2000); *In re Lane,* 280 F.3d 663(6th Cir.2002); *In re Tanner,* 217 F.3d 1357 (11th Cir.2000).

**3.** *See In re Dickerson,* 222 F.3d 924 (11th Cir.2000).

**4.** *See Holloway v. United States,* No. 01–C–4052, 2001 WL 1249053 (N.D.Ill. Oct.16, 2001).

**5.** *See Barnes v. American Gen. Fin. (In re Barnes),* 207 B.R. 588 (Bankr.N.D.Ill.1997). *But see In re Reeves,* 221 B.R. 756 (Bankr. C.D.Ill.1998).

§ 1322(b)(2) used the broader term "claim" (rather than "secured claim") to describe what was protected from modification in the clause creating the exception to the general rule, which permits the modification of secured claims; therefore, all of the rights for which the unsecured creditor bargained under the mortgage agreement—even ones that are unsecured under a § 506(a) analysis—were protected from a lien strip down in *Nobelman*. *Id.* at 330–31, 113 S.Ct. 2106. Under the final part of the Supreme Court's analysis, the mere existence of an enforceable, perfected security interest in the debtor's principal residence determined the extent of protection under § 1322(b)(2), not a § 506(a) valuation analysis. *Id.* at 329, 113 S.Ct. 2106.

In applying *Nobelman* to the current context of lien strip offs, the minority position reasons that the extent of modification protection that § 1322(b)(2) bestows upon wholly unsecured mortgagees should similarly turn on the mere existence of a perfected security interest enforceable under state law, regardless of whether a § 506(a) analysis shows that value exists to support the lien. *See Lam*, 211 B.R. at 40 (describing rejected position); *In re Perkins*, 237 B.R. 658, 660 (Bankr.S.D.Ohio 1999); *Barnes*, 207 B.R. at 592. It argues that its approach is bolstered both by the Supreme Court's focus on the aggregate set of rights flowing from mortgage documents as well as by Congress's use of the broader term "claim" to define the boundaries of the anti-modification clause. *See id.; see also Dickerson*, 222 F.3d at 926 (dicta); *Bartee*, 212 F.3d at 287–88 (describing rejected position). Consequently, it reads *Nobelman's* principal focus as being on the mortgage holder's underlying rights and claim, whether or not wholly unsecured for purposes of § 506(a). The minority position further contends that the Supreme Court's preliminary application of § 506(a) in *Nobelman* was dicta that should not be taken out of the context of the rest of the opinion, which assigns great importance to its discussion of the state-law rights of those holding a principal residence mortgage at the heart of the decision. *See Barnes*, 207 B.R. at 592–93. A rule permitting lien strip offs would thus supposedly open the loophole *Nobelman* tried to close. *See id.*

The Court, however, believes that the only loophole *Nobelman* closed was to prevent strip downs of partially undersecured home mortgages and did not deal with the situation here—a wholly unsecured junior home mortgage. The discussion in *Nobelman* focusing on the home mortgagee's rights was in the context of the actual issue before the Supreme Court: whether § 1322(b)(2) protects both the secured and unsecured portions of an undersecured first mortgage, not a wholly unsecured junior mortgage. *See Lam*, 211 B.R. at 40. There is no question that under *Nobelman*, Wells Fargo Home Mortgage, the holder of the first mortgage in this case, cannot have its lien stripped down or modified. In *Nobelman's* context, the total package of protected rights stemmed from a claim which was actually secured to some extent under a § 506(a) analysis, *see Mann*, 249 B.R. at 837, and thus the Supreme Court significantly noted in *Nobelman* that "the bank is *still* the 'holder' of a 'secured claim,' *because* petitioners' home retains $23,500 of value as collateral." *Nobelman*, 508 U.S. at 329, 113 S.Ct. 2106 (emphasis supplied); *see Lane*, 280 F.3d at 667; *Pond*, 252 F.3d at 126; *Bartee*, 212 F.3d at 286, 290; *Mann*, 249 B.R. at 833; *Lam*, 211 B.R. at 40–41. That result and logic applies here to the first mortgage holder, who has an undersecured first mortgage. The use of the word "because" implies that the lien's attachment to at least some equity was pivotal in determining whether a secured claim existed in the

first place. This language choice is still consistent with the Supreme Court's later discussion of Congress's use of the broad term "claim" in the anti-modification clause. *See McDonald,* 205 F.3d at 611–12. The two parts of *Nobelman* are consistent because a creditor—before invoking the wide protections resulting from Congress's use of the broader word "claim" in the exception clause—must first establish that he has a "secured claim," because this term of art first appears in § 1322(b)(2) as the category to which the anti-modification clause granting special rights attaches. Once a creditor meets the threshold requirement defined in § 506(a)—whether the claim is fully secured, or only secured to the extent of one cent—all of the state-law rights adhering to both the secured and unsecured portions of his entire "claim" then receive protection, because "Congress consciously chose the unqualified term 'claim' rather than the term of art 'secured claim' when crafting the antimodification provision." *Bartee* 212 F.3d at 287; *see McDonald,* 205 F.3d at 609–10.

Moreover, the specialized focus on rights, although important, was not the only basis for the decision in *Nobelman. See Bartee,* 212 F.3d at 290. Section 103(a) of the Bankruptcy Code makes Chapter 5 of the Code and thus § 506(a) and (d) applicable to Chapter 13 cases. *See Lane,* 280 F.3d at 666; *Mann,* 249 B.R. at 833. Still, the Fifth Circuit opinion, which the Supreme Court reviewed in *Nobelman,* determined that § 506(a) and § 1322(b)(2) were in conflict and that, furthermore, § 506(a) was not applicable by virtue of being the more general of the two provisions. Although it affirmed the Fifth Circuit's result, the Supreme Court specifically rejected its conclusion regarding § 506(a), instead sanctioning a different approach that gives both provisions meaning. *See Bartee,* 212 F.3d at 286; *Mc-*

*Donald,* 205 F.3d at 609–10. The Supreme Court first used § 506(a) to define a secured claim before applying § 1322(b)(2). *See Lam,* 211 B.R. at 40; *Mann,* 249 B.R. at 836–37. This approach of first applying § 506(a) would have been meaningless if the existence of value to support a mortgage were unnecessary to receive protections for the bundle of state-law rights under § 1322(b)(2). *See Tanner,* 217 F.3d at 1360. "Courts hardly need to perform a valuation of the collateral to adopt the original state-law label of the claim as secured." *McDonald,* 205 F.3d at 611. After it determined that it was dealing with a secured claim, the *Nobelman* Court proceeded to broadly construe the protection for undersecured home mortgagees' "rights of holders of secured claims" that are "claim[s] secured only by a security interest in real property that is the debtor's principal residence." 508 U.S. at 330–31, 113 S.Ct. 2106.

Furthermore, *Nobelman's* discussion of § 506(a) was not dicta. Dicta is "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *Sarnoff v. American Home Prods. Corp.,* 798 F.2d 1075, 1084 (7th Cir.1986). The statements concerning § 506(a) are only dicta if one considers the minority position to be the correct one before reading *Nobelman.* Otherwise, such discussion serves a meaningful purpose in the Supreme Court's analysis, because the Fifth Circuit ruled that § 506(a) was inapplicable, and the Court's overall analysis attempted to reject this conclusion by showing that § 506(a) could be reconciled with § 1322(b)(2). *See Nobelman,* 508 U.S. at 330–31, 113 S.Ct. 2106; *Lane,* 280 F.3d at 667; *McDonald,* 205 F.3d at 611. This is

also in keeping with the statutory construction principle of harmonizing, where possible, various statutory provisions rather than virtually ignoring or negating one for the other. *See In re Johnson,* 787 F.2d 1179, 1181 (7th Cir.1986); *In re Robison,* 665 F.2d 166, 171 (7th Cir.1981). This is what the minority view does effectively to the starting point in *Nobelman's* analysis— § 506(a).

 The Supreme Court's focus on rights in *Nobelman* is thus inapposite to lien strip offs because wholly unsecured creditors' rights, unlike the rights of the bank in *Nobelman,* are actually empty, hypertechnical rights with little practical or economic effect. *See Mann,* 249 B.R. at 837–38. That is, "[o]utside of bankruptcy, a lien with no collateral value cannot deliver any funds to the lienholder upon foreclosure." *Id.* This is so because at foreclosure sales, junior mortgagees would have to bid and pay cash for the full amount of the senior lien in order to protect otherwise worthless junior mortgages. In the real world of mortgage foreclosures, junior lienholders usually only bid if there is value in the property greater than the amount owed on the first lien. Yet, inside a bankruptcy case where a lien strip off under the minority view is impermissible, such a lienholder would be required to be paid in full as a result of § 1325(a)(5)(B), while other general unsecured claims are paid less in bankruptcy dollars even though they, too, are not supported by collateral value. *See Mann,* 249 B.R. at 838. True, a secondary lienholder has a general contractual right to benefit from an increase in the value of collateral; however, the need for a final determination of property valuations (usually as of the date of the petition) in bankruptcy cases precludes ongoing valuations just as it does in the context of exemption determinations. *See id.* at 838–39. Therefore, this latter right is similarly illusory once the need for a bankruptcy valuation arises.

The minority position has additionally argued that neither the explicit language of § 1322(b)(2) nor the majority opinion in *Nobelman* discriminates between senior and junior mortgagees; therefore, Congress has not chosen to make such a distinction, and the federal courts should await further amendments to § 1322(b)(2) before discriminating. *See Barnes,* 207 B.R. at 593. But, the real issue is the interplay between § 1322(b)(2) and § 506(a), and the latter provision indeed applies to the case at bar (in conjunction with § 1322) according to both *Nobelman* and § 103(a). Section 506(a) provides the basis for finding that Congress intended discrimination between senior and (wholly unsecured) junior lienholders when the anti-modification clause in § 1322(b)(2) is at issue.

## B. Response to Claim that Majority Rule Perpetuates Uncertainty of Ongoing Valuations

The minority position argues that if a bankruptcy court were to permit lien strip offs by applying § 506(a) in conjunction with § 1322(b)(2), the decision could produce unintended, chaotic results in Chapter 13 cases. Because no provision explicitly limits § 506(a)'s application to a certain time period, a debtor could assert it post-confirmation if the value of his residence fell, rendering a second mortgagee's claim wholly unsecured rather than undersecured; thus, the Chapter 13 confirmation process would be merely provisional. *See Barnes,* 207 B.R. at 593. In one sense, because confirmed plans can be amended and modified pursuant to 11 U.S.C. § 1329, the confirmation process in Chapter 13 is inherently provisional in contrast to the process in Chapter 11, which includes a prohibition on post-con-

firmation modification of substantially consummated Chapter 11 plans in 11 U.S.C. § 1127(b). In the case at bar, though, the concern is not present, because the Debtor scheduled the Property at a value of $87,000 and indicated on her Schedule A that the "2d Mortgage [Is] To Be Avoided." Also, this is the first requested evaluation made in this case under § 506(a).

The concern, however, is generally unfounded. When such a conflict actually arose, the Bankruptcy Court for the District of New Jersey disposed of this problem as a matter of law. In *In re Cruz*, 253 B.R. 638 (Bankr.D.N.J.2000), the debtor listed on his schedules a principal residence worth $40,000, an amount that required the debtor to pay in full the arrears on his first mortgage, to continue to make regular payments on his first mortgage, and to pay in full the claim secured by a second mortgage. *See id.* at 640. Eighteen months after plan confirmation, the debtor filed a motion to amend the Chapter 13 plan to reflect a subsequent valuation of his home at $26,900 based on a local property tax assessment. *See id.* He proposed to change the second mortgagee's status to that of a wholly unsecured creditor and to perform a lien strip off, as now permitted in the Third Circuit Court of Appeals. *See id.* The court held that because § 1329(a) and § 1325(a)(5)(B) permit a plan modification only to adjust the amount and timing of individual payments on allowed secured claims and not to adjust the classification or the total amount of such claims, plan confirmation is res judicata as to the amount and classification of a secured creditor's claim. *See id.* at 641–42. The court also noted that the home valuation issue should have been litigated prior to confirmation, so the debtor could not rely upon a post-confirmation value estimate and was bound by the estimate listed on his bankruptcy schedules under penalty of perjury. *See id.* at 642–43; *see also* 11 U.S.C. § 1327(a).

In the present case, the value for the subject Property has not changed as it did in *Cruz*, and the Schedules indicate that the Debtor's intent is to avoid the subject junior mortgage lien. The Court further notes that under the current model plan format required by all judges of this Court for Chapter 13 cases filed on or after August 1, 2001, a format in which all secured claims are to be specifically named by their express treatment, any real likelihood of undermining the res judicata effect of the confirmation order here, as was attempted in *Cruz*, no longer exists.

## C. Analysis Based on Policy and Legislative Intent

The minority view notes that permitting lien strips offs under § 506(d) can produce absurd results. If the first mortgagee's claim is for $50,000 and the value of the principal residence is $50,000, the second mortgagee has no secured claim under § 506(a) and thus receives no protection against modification. However, if the same residence were valued at $50,001, the second mortgagee would technically be an undersecured creditor (like the bank in *Nobelman*) and would thus have a claim fully protected against modification—even though its claim is almost completely unsecured according to a § 506(a) analysis. This rule, therefore, places too much weight on the inexact estimation process of appraisers. *See Dickerson*, 222 F.3d at 926 (dicta); *Bartee*, 212 F.3d at 290 (describing rejected position). It does not foster predictable results, either, because results will hinge on the fluctuating real estate market values. *See Barnes*, 207 B.R. at 593. Thus, a bright-line rule permitting lien strip offs could produce arbitrary and potentially unjust results. *See Perkins*, 237 B.R. at 660–61.

Unpredictable results, however, inevitably occur as a result of the statutory interplay between § 506(a) and (d) as applied to each factual scenario, depending upon the value of the property in question and the amount of the various claims encumbering the same. Also, these types of bright-line distinctions exist everywhere in the law generally and in the Internal Revenue and Bankruptcy Codes in particular, and they almost always appear arbitrary and unfair at the margins. *See Lane,* 280 F.3d at 669; *McDonald,* 205 F.3d at 613; *Mann,* 249 B.R. at 838–39. Other examples under the Bankruptcy Code include the thirty-day period for parties to contest exemptions under Federal Rule of Bankruptcy Procedure 4003(b) and the result of failing to do so under 11 U.S.C. § 522($l$), which the Supreme Court strictly construed in *Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); the choice Congress made in § 1322(b)(2) to avoid protecting claims secured either by other types of real property or by personal property with the anti-modification clause;[6] and §§ 109(e), 507(a)(3)-(6), 522(d), 523(a)(2)(C), and 547(c)(8). *See Mann,* 249 B.R. at 839.

The minority view also contends that Congress intended to unequivocally protect all lending secured by principal residences regardless of a particular loan's purpose. *See Bartee,* 212 F.3d at 292 (describing rejected position). Congress, however, by originally intending to encourage the flow of capital into the home-lending market enacted § 1322(b)(2), actually had only first mortgagees, or true mortgage lenders, in mind, because second mortgagees are generally involved with home improvement, debt consolidation, or consumer financing—not home purchases or construction. *See Tanner,* 217 F.3d at 1359; *Bartee,* 212 F.3d at 292–93; *Lam,* 211 B.R. at 41. Protecting secondary mortgagees will have virtually no impact on home building and buying, as they are more akin to general unsecured creditors and secured consumer lenders. *See Bartee,* 212 F.3d at 293; *McDonald,* 205 F.3d at 613. Moreover, protecting second or third mortgagees will bestow upon them windfalls, as they are able to convert otherwise dischargeable unsecured debt into nondischargeable secured debt; this unintended benefit is particularly unearned by the many opportunistic and predatory lenders who abuse mortgage lending by over appraising property or by burdening already oversecured property. *See Bartee,* 212 F.3d at 292–93; *Mann,* 249 B.R. at 839–40. The exception to § 1322(b)(2) found in § 1322(c)(2),[7] which was added by the 1994 amendments to the Bankruptcy Code, is additional evidence that Congress did not intend to include disguised consumer lending under the umbrella of protections afforded in § 1322(b)(2)'s anti-

---

**6.** If lien strip offs are permissible after *Nobelman,* wholly unsecured creditors who nonetheless still have a piece of paper granting them a security interest will be in no worse a legal position under § 1322(b)(2) than a creditor secured by any collateral other than real property that is the debtor's principal residence, even real property used for commercial purposes and valuable personal property. *See McDonald,* 205 F.3d at 613–14. Thus, the heightened anti-modification clause protections resulted from Congress's fine-line statutory distinctions in the first place.

**7.** "Notwithstanding subsection (b)(2) and applicable nonbankruptcy law ... in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title." 11 U.S.C. § 1322(c)(2).

modification clause. *See Bartee,* 212 F.3d at 294.

The windfall created by the minority rule, moreover, could produce unintended undesirable results. If lien strip offs of wholly unsecured junior home mortgages are not permitted because of § 1322(b)(2), creditors who would normally be unsecured creditors will be encouraged to extract junior mortgages on overburdened homes to receive the anti-modification protections of this section. *See Lam,* 211 B.R. at 41. The burden of this protection on debtors would conceivably force more of them into bankruptcies under Chapter 7, although Congress has a clear preference for Chapter 13 cases, *see Bartee,* 212 F.3d at 284, which are more rehabilitative and usually more profitable for general unsecured creditors than Chapter 7 cases. *See McDonald,* 205 F.3d at 614. Ironically, then, a rule prohibiting lien strip offs under § 506(d) because of § 1322(b)(2) actually might end up putting many wholly unsecured creditors in the same position they would be in under a rule permitting lien strip offs. Faced with having to pay considerably more to keep homes worth substantially less than the totals of the claims of all mortgagees, Chapter 13 debtors may be compelled to convert to Chapter 7 cases, *see Bartee,* 212 F.3d at 294, whereby wholly unsecured mortgagees (otherwise protected by § 1322(b)(2)'s anti-modification clause) would be deemed to have entirely unsecured claims pursuant to § 506(a) and would receive virtually the same amount they would receive as a wholly unsecured mortgagee subject to a lien strip off. *See McDonald,* 205 F.3d at 614. Therefore, Congress's preference for Chapter 13 cases would be thwarted, while wholly unsecured junior lienholders initially permitted to retain their liens in a pre-

conversion Chapter 13 case would end up in virtually the same position as junior lienholders subjected to lien strip offs in the first place.

## IV. CONCLUSION

It is undisputed that the amount owed on the first mortgage, $92,361.99, exceeds the estimated value of the Property, $87,000.00. Consequently, the claim of the junior mortgage lienholder is wholly unsecured, and the lien should be stripped off the Property and avoided under § 506(d) if the Debtor performs under the confirmed plan and makes all required payments. In the event the plan fails, the Debtor does not consummate the confirmed plan, and the case is dismissed, the junior mortgage holder's lien shall be reinstated pursuant to 11 U.S.C. § 349(b)(1)(C).[8]

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

---

**8.** "Unless the court, for cause, orders otherwise, a dismissal of a case … reinstates … any lien voided under section 506(d) of this title." 11 U.S.C. § 349(b)(1)(C).